# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 01/02/2019 02:42 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Sino-Cruz,Deputy Clerk
19STLC00037

Azadeh Sinai (Cal Bar No. 293501)
CMG Worldwide, Inc.
9229 Sunset Blvd., Suite 950
West Hollywood, California 90069
Tel: 310-651-2000
Fax: 317-732-7169
Email: azadeh@cmgworldwide.com

*Attorney for CMG Worldwide, Inc., Plaintiff*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| CMG WORLDWIDE INC., ) | CASE NO. _____ |
| ) | |
| Plaintiff, ) | **(Assigned to Hon. _____)** |
| ) | |
| vs. ) | **COMPLAINT FOR DECLARATORY** |
| ) | **RELIEF THAT PLAINTIFF HAS** |
| DREAMS FULFILLED, LLC, ) | **FULFILLED TERMS OF CERTAIN** |
| ) | **LICENSE AGREEMENT DATED** |
| Defendant. ) | **FEBRUARY 27, 2018** |
| ) | |

Comes now Plaintiff CMG WORLDWIDE, INC. ("CMG"), by counsel, Azadeh Sinai Samimi, and for its Complaint for Declaratory Relief (the "Complaint") as against Defendant DREAMS FULFILLED, LLC ("Defendant"), CMG would respectfully show the court as follows:

**I.     THE PARTIES.**

1.     CMG, a corporation, existing under the laws of the State of Indiana, and doing business in California, Los Angeles County at 9229 Sunset Blvd., Suite 950, West Hollywood,

California 90069, is a celebrity licensing agency, recognized around the world as agent and representative for internationally recognized celebrities and sports personalities as James Dean, Maya Angelou, Arthur Ashe, Ernie Banks, and Jackie Robinson.

2. Defendant, incorporated and headquartered in the State of Washington, produces baseball memorabilia.

## II.   JURISDICTION AND VENUE.

3. Jurisdiction is proper in this Court by virtue of the forum selection clause contained in the License Agreement dated February 27, 2018 between the parties (the "Agreement") which Agreement forms the subject matter of this dispute. See Exhibit 1, the Agreement, at ¶ 25.

4. Venue is proper in this Court by virtue of the forum selection clause contained in the Agreement. Id.

## III.   NATURE OF THE CASE.

5. It is undisputed that the Parties entered a written contractual relationship, as more fully described hereinbelow, on February 27, 2018. See generally Exhibit 1.

6. On or about September 10, 2018, Defendant notified CMG in writing, pursuant to the terms of the Agreement, that it intended to sue CMG, and others, for CMG's alleged breach of the Agreement. See Exhibit 2, letter dated September 10, 2018 from Tyler Farmer, Defendant's outside counsel (the "Farmer Letter").

7. A complaint for declaratory relief is sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties

**COMPLAINT FOR DECLARATORY RELIEF**

under a written instrument and requests that these rights and duties be adjudged by the court. Cal. Civ. Code § 1060.

8. By virtue of the existence of a written agreement between the parties (the Agreement) and an actual controversy relating to the legal rights and duties of the parties under the Agreement as evidenced by the Farmer Letter, this Complaint for Declaratory Relief is a just, necessary, and proper means by which the adjudication of the parties rights and duties under the Agreement may be made by this Court.

## IV. FACTUAL ALLEGATIONS.

### A. Jackie Robinson and CMG.

9. CMG is the exclusive, worldwide agent and representative for the estate of Jackie Robinson (the "Robinson Estate") and his wife Mrs. Rachel Robinson, and is the sole representative with the necessary authority to act on behalf of the Robinson Estate in the administration and licensing of certain trademark rights, the right of association and sponsorship, and the right of publicity in and to the name, image, voice, signature, and likeness of the late Jackie Robinson (collectively, the "Robinson Intellectual Property"). CMG licenses Jackie Robinson's name, likeness, images, signatures, persona, and other related indicia to third parties. Under its various agreements with the Robinson Estate, CMG is charged with the exclusive responsibility and authority to enforce Jackie Robinson's intellectual property rights.

10. Jackie Robinson is one of the most famous athletes in U.S. history, as well as a hero of the American Civil Rights Movement. Jackie Robinson grew up in Pasadena, California and played sports for Pasadena Junior College and later for the University of California, Los

Angeles ("UCLA"), where he won varsity letters in baseball, basketball, football, and track and was named to the All-American football team in 1941.

11. Jackie Robinson became the first African American to play major league baseball in the modern era when he was signed to the Brooklyn Dodgers in 1947, breaking the league's color barrier. This was significant not just for major league baseball, which had been segregated since 1889, but also for American professional athletics as a whole.

12. Jackie Robinson went on to receive the inaugural Major League Baseball ("MLB") Rookie of the Year Award in 1947 and was also the first African American baseball player to receive the National League Most Valuable Player Award. During his illustrious 10-year career in baseball, Jackie Robinson was an All-Star for six consecutive seasons, played in six World Series, and contributed to the Dodgers' 1955 World Series championship.

13. In 1981, the UCLA baseball field named "Jackie Robinson Stadium" was opened, and in 1984, Jackie Robinson was inducted into the UCLA Hall of Fame. In 1988, "Jackie Robinson Memorial Field," next to the Rose Bowl in Pasadena, was also dedicated to and named in Jackie Robinson's honor.

14. In 1997, the MLB retired Jackie Robinson's uniform number, 42, across all major league teams. The MLB also adopted the annual tradition "Jackie Robinson Day," held for the first time on April 15, 2004 (and every year after), on which every player on every team wears the number 42.

15. In addition to his achievements on the baseball field, Jackie Robinson was known for his character and his courage and grace in the face of inequality and racism. After his retirement from baseball, Jackie Robinson became the first African American vice president of a

**COMPLAINT FOR DECLARATORY RELIEF**

major American corporation and continued to work tirelessly for racial equality, including serving in numerous campaigns for the NAACP and on the organization's board of directors.

16. "42," a biographical film about Jackie Robinson, was released in 2013; the film was incredibly popular at the box office and with critics. Given the recent inauguration of Jackie Robinson Day and the celebration of his life in film, Jackie Robinson remains the subject of attention, publicity, and comment in the present day.

17. Based on the media's longstanding and extensive coverage of Jackie Robinson and his status as an exceptional baseball player and Civil Rights hero, Jackie Robinson's name, image, and likeness have earned worldwide fame and recognition and are well-known by members of the public as identifying him. CMG has therefore worked extensively to build and sustain Jackie Robinson's brand, along with the rights to his intellectual property, to honor him and to foster a continuing celebration of his legacy.

18. On behalf of the Estate of Jackie Robinson, and for the past 25 years, CMG has and continues to ensure that all commercial uses of the Robinson Intellectual Property adhere to the high standards of the Robinson Estate.

19. In that regard, and in order to guarantee the overall integrity and value of the Robinson Intellectual Property, CMG and the Estate adhere to very strict, multi level approval standards and at all times reserve the right to withdraw their approval at any of these various stages when the product to be approved might not reflect favorably on Jackie Robinson's rich time honored legacy.

///

///

**COMPLAINT FOR DECLARATORY RELIEF**

**B.     The Agreement for the Use of the Robinson Intellectual Property.**

20.     In February 2018, CMG, on behalf of the Robinson Estate, negotiated and entered into the Agreement, under the terms of which Defendant was authorized, subject to CMG and the Robinson Estate's approval, to use the Robinson Intellectual Property on and/or in connection with t-shirts, coasters, notecards, card sets, glassware (including products made of metal or ceramic), giclée (including prints), statutes (sic) *and/or* bobbleheads (collectively, the "Merchandise").  See Exhibit 1 at ¶2(a) (emphasis added).

21.     CMG entered into the Agreement with Defendant, despite the fact that Defendant was newly organized (in late October, 2016) and had limited channels of distribution for the Merchandise or, for that matter, did not have a license with Major League Baseball ("MLB") for the use of the MLB logos which was important because of the logo images that Defendant wanted to use on the various products.

22.     CMG, though, did recognize what it believed, at the time of the negotiations of the terms of the Agreement, Defendant's objectives to achieve a successful licensing campaign in light of Defendant having embarked on this project to celebrate the 100th anniversary of the late Jackie Robinson's 1919 birth and the centennial of the 1920 founding of the Negro National League.

23.     Defendant, at the time the Agreement was negotiated, entered into licenses and negotiations with various CMG baseball clients that were associated with the Negro Leagues. Defendant's overall vision for the program was believed to encompass promotion of the Negro League Baseball history while at the same time raising money for the Negro League Baseball Museum  and the players' families through royalties generated from various product sales of

various baseball collectibles.  These items included t-shirts, coasters, notecards, card sets, glassware, giclée, prints, statues and /or and bobbleheads.  These items would primarily be distributed through the Negro Leagues Baseball Museum to benefit the museum but also because Defendant had no other substantive distribution channels.  Defendant ultimately negotiated several different licenses for various CMG clients for a host of different products, including bobbleheads.

24. With respect to Jackie Robinson products, CMG informed Defendant that the Robinson Estate did not license bobbleheads that had disproportionate body parts.  Therefore, the product would have to appear as a life like statue of Jackie Robinson.

25. The approval language contained in paragraph 5 required Defendant to submit a physical model for final approval to CMG to be approved by CMG and the Robinson Estate.  See Exhibit 1 at ¶5.  Defendant never provided CMG or the Robinson Estate with a physical model for final approval; thus, neither CMG nor the Robinson Estate gave final approval of the product for production and distribution.

26. In fact, Defendant clearly understood the approval process required receipt and approval of an actual physical product model because Defendant, in communication with CMG, informed CMG in an email dated April 11, 2018 that "... Once that [the model] is approved, we [Defendant] can send you a physical model for final approval.  Once approved, we go into production."

27. Despite the fact that Defendant never submitted an actual physical product model for approval, thus, neither CMG nor the Robinson Estate could approve the product for manufacturing and distribution under the plain language of the Agreement, Defendant has

asserted in written communication that CMG is in breach of the Agreement and Defendant has further threatened to sue CMG for its alleged breach of the Agreement not only in the letter provided (Exhibit 2) but in the attachment to Exhibit 2, a draft complaint which Defendant informed CMG would be filed.

28. In addition to requiring Defendant to submit for approval all Merchandise, together with its cartons and containers, including packaging and wrapping material, the Agreement also requires that Defendant submit any "advertisements and promotional material which Licensee intends to use to promote Goods…." to CMG prior to the use of any such advertisements or promotional material.

29. Despite the claim that CMG's alleged breach has resulted in losses to Defendant, Defendant has not been estopped from creating any other Merchandise allowed under the Agreement (i.e., t-shirts, coasters, notecards, card sets, glassware (including products made of metal or ceramic), gicleés (including prints), or statutes (sic)), at the time of this filing, and as such, CMG has fulfilled and continues to fulfill its required duties under the Agreement.

### V. THE CLAIM FOR DECLARATORY RELIEF.

**(Declaration of No Breach of Contract under California State Law)**

30. CMG restates, realleges, and reiterates its allegations in paragraphs 1. through 28. as if fully set forth herein.

31. Defendant claims that CMG breached the Agreement by clearly and positively indicating by words or conduct that CMG would not meet the terms of the Agreement.

32. Defendant claims that CMG also breached the Agreement by unfairly interfering with Defendant's right to receive benefits under the Agreement.

33. There is an actual and justiciable controversy between the parties whether CMG has breached the Agreement as articulated by counsel for Defendant in Exhibit 2.

34. Absent a declaration that CMG's actions under the terms of the Agreement do not constitute breach of contract, Defendant will continue to assert that CMG has breached the Agreement and in this way will cause CMG ongoing and continuing harm and damage.

35. CMG seeks a declaration that it has not breached the Agreement.

## VI.     PRAYER FOR RELIEF.

WHEREFORE, Plaintiff CMG WORLDWIDE, INC (CMG), by counsel Azadeh Sinai Samimi, hereby respectfully prays for judgment against Defendant Dreams Fulfilled, LLC (Defendant) and, as such, requests that the Court:

a. Declare that CMG has fulfilled the terms of the certain license agreement dated February 27, 2018 (the Agreement) between the parties for the use of the Robinson Intellectual Property;

b. Declare that CMG actions and/or inactions as claimed by Defendant do not constitute a cause of action for breach of contract under California state law or, more specifically that CMG has not breached the Agreement by way of its actions or inactions as claimed by Defendant;

c. Declare that CMG has no further obligation to Defendant in the fulfillment of the Agreement;

d. Award CMG its reasonable attorneys' fees and costs as required under the terms of ¶25 of the Agreement; and

e. Award CMG all other and further relief as is just, necessary, and proper in the premises.

Dated: Los Angeles, California  
December 31, 2018

CMG WORLDWIDE, INC.,

By:_____  
Azadeh Sinai (Cal Bar No. 293501)

9

**COMPLAINT FOR DECLARATORY RELIEF**

*Attorneys for Plaintiff CMG Worldwide, Inc.*

**COMPLAINT FOR DECLARATORY RELIEF**

## LICENSE AGREEMENT

This license agreement dated February 27, 2018 (hereinafter referred to as "Agreement"), is between Mrs. Rachel Robinson (hereinafter referred to as "Licensor"), % CMG Worldwide, Inc., located at 9229 West Sunset Boulevard, Suite 950, West Hollywood, California 90069 and Dreams Fulfilled, LLC (hereinafter referred to as "Licensee") located at 4824 102nd Lane NE, Kirkland, Washington 98033.

**WITNESSETH:**

WHEREAS, Licensor is the proprietor of various trademark rights and the right of publicity associated with the name, likeness, voice, signature and visual representation of Jackie Robinson (collectively hereinafter referred to as "Property"). WHEREAS, Licensee desires to utilize said Property upon the terms and conditions set forth below.

NOW THEREFORE, in consideration of the mutual promises and undertakings herein contained and for other good and valuable consideration, intending to be legally bound, the parties agree as follows:

1. **Definition of Terms.**
   (a) "Original Term" shall mean the period beginning upon execution hereof and ending on December 31, 2020.
   (b) "Contract Year" shall mean the period commencing on January 1st and ending on December 31st of each year of this Agreement.
   (c) "Premium" shall mean any article used for the purpose of: increasing the sale of another item; promoting or publicizing any product or service; fundraising or as giveaways; to motivate a sales force, merchant, consumer, or any other person to perform a specific act.

2. **Grant of License.**
   (a) Subject to the limitations set forth in paragraph 2(c) below and the other conditions of this Agreement, Licensor hereby grants to Licensee the right to use the Property in connection with the following products (collectively hereinafter referred to as "Goods"):
   - Tshirts (hereinafter "Shirts"); and
   - Coasters, notecards, card sets, glassware (including products made of metal or ceramic), glicees (including prints), statutes and/or bobbleheads (hereinafter "Other Products").

   All Goods will bear only artwork produced from artists Graig Kreindler, Monty Sheldon, Robert Blehert, and Jeff Suntala.
   (b) Market and Territories (collectively hereinafter "Territory"):
   - Other Products: Worldwide;
   - Shirts: Through Licensee's website, the Negro League Baseball Museum store and website, and no more than six (6) total museum locations where Licensee may stage exhibits in connection with Jackie Robinson.
   (c) Limitations on License: No license is granted hereunder for the use of the Property for any purpose other than in connection with the Goods. No license is granted hereunder for the manufacture, sale or distribution of Goods to be used as Premiums, for publicity purposes, as giveaways, or to be disposed of under similar methods of merchandising. In the event Licensee desires to sell Goods for such purposes, Licensee acknowledges and agrees that it must first seek and obtain a separate license from Licensor and that the user thereof must also obtain a separate license from Licensor for such use of Goods. Furthermore, Licensee specifically agrees and acknowledges that making, using, and/or selling of any unauthorized goods, articles, and/or promotional materials which uses any aspect of the Property, including any variety of elements of Jackie Robinson's likeness, is an infringement of the Property that may result in serious damages, dilution, and tarnishment to the integrity, distinctiveness, and value of the Property and will constitute material breach of this Agreement. Licensee shall neither contest nor object to immediate termination of this Agreement, and/or the injunctive relief against manufacture, use, and/or sales of any such goods, articles, and/or promotional materials.

3. **Advance and Royalty.**
   Shirts and Other Products: Licensee agrees to pay Ten Thousand United States Dollars ($10,000) as a nonrefundable advance, recoupable against royalties earned through the Original Term and payable immediately upon execution of this Agreement. Licensee shall recover the advance by offsetting royalties earned against said advance until

the advance is recouped and shall thereafter make the royalty payments to Licensor as set forth herein. Licensee agrees to pay royalties to Licensor for each unit of the Shirts and Other Products as follows: 12% of Licensee's "wholesale price" or 6% of Licensee's "retail price" in United States dollars computed upon the total number of units shipped or otherwise distributed by Licensee or any of its affiliated, associated (including reps and/or distributors) or subsidiary (hereinafter "Related") companies, without deductions for bad debt, cost of shipping, cost of packaging, advertising or promotional expenses, cash or volume discounts or other costs. A deduction of not more than 5% may be taken for actual certified returns. The term "wholesale price" as used herein shall mean the actual invoiced price charged by Licensee, or by any of its Related companies, to any unaffiliated third parties for retail sale of the Goods described in paragraph 2, hereof. The term "retail price" as used herein shall mean the actual invoiced price charged by Licensee, or by any of its Related companies, to direct consumers. For any Goods sold as a set, such as a baseball card set, the royalty shall apply only to that fraction calculated by dividing: (x) the number of instances of Jackie Robinson in the given set of Goods, by (y) the number of instances of all individuals contained in the given set of Goods[1].

4. **Payment and Reporting.**
Not later than the thirtieth (30th) day after the close of every month during the Original Term and any extension thereof, and thereafter so long as any sales are made by the Licensee pursuant to this Agreement, the Licensee shall furnish to the Licensor a full and complete statement (along with any payment owed) showing the number of Shirts and Other Products which have been sold by the Licensee and the selling price thereof during the preceding month. An item will be considered to be sold when it is ordered and then invoiced or shipped, whichever is sooner. All payments shall be drawn on U.S. funds payable to "CMG Worldwide, Inc.". All late payments shall be subject to a one percent per month (12% annual rate) late charge on all such outstanding amounts.

5. **Quality.**
Licensee acknowledges that if the Goods manufactured and sold by it are of inferior quality in material and workmanship, the substantial goodwill which the Licensor has built up and now possesses in the Property will be impaired. Accordingly, Licensee warrants that the Goods will be of high standard and of such appearance and quality as shall be reasonably adequate and suited to their exploitation and best advantage. Licensee shall submit to Licensor finished artwork and/or a facsimile of all Goods to be manufactured, together with its cartons and containers, including packaging and wrapping material, which shall be approved in writing by the Licensor before the Goods are advertised, distributed or sold. Any article submitted and not disapproved within fourteen (14) days of their receipt of same by Licensor shall be deemed to have been approved. After samples of the Goods have been approved pursuant to this paragraph, Licensee shall not depart therefrom without written consent from Licensor. In the event there is a departure from the approved sample of the Goods made or distributed by Licensee, or in the event there is an occurrence connected with the Goods which reflect unfavorably upon Licensor, the Licensor shall have the right, in the reasonable exercise of its sole discretion, to withdraw its approval of such Goods, at which time this Agreement shall automatically terminate with respect to such Goods; provided however that such right shall only be exercisable after Licensor has provided notice to Licensee of the circumstances leading to the proposed withdrawal and Licensee has failed to reasonably cure such circumstances within fifteen (15) days of notice. Thereupon, Licensee shall cease the use of the Property in the sale, advertising, distribution or use of such Goods immediately upon notice from Licensor; and within ten (10) days thereafter shall pay all amounts due to Licensor hereunder. If there are other Goods under this Agreement not covered or affected by the foregoing two sentences of this paragraph, this Agreement shall remain in full force and effect as to those other Goods.

6. **Advertising.**
All advertisements and promotional material which Licensee intends to use to promote Goods shall be submitted to Licensor for its written approval prior to publication. Licensor shall have fourteen (14) days from the date of receipt of said material in which to approve or disapprove it, such approval not to be unreasonably withheld.

7. **Samples.**
Licensee shall supply Licensor with samples of each of the completed Goods promptly after completion, as follows: (a) For

---

[1] By way of example, a card set containing Jackie Robinson's image 5 times in a card set of 250 player images will earn a royalty for each card set sold equal to: (x) the appropriate royalty percentage * (y) the wholesale or retail price of the card set, as appropriate * (z) 5 divided by 250.

Goods having a cost of goods sold (including royalties) less than Twenty Dollars ($20.00), five (5) samples; (b) For all other Goods, two (2) samples.

8. **Books and records.**
   (a) The Licensee shall keep full, complete and accurate books of account and records covering all transactions relating to the subject matter of this Agreement. Licensor through its authorized representative, shall have the right to examine such books of account and records and other documents and material in Licensee's possession or under its control insofar as they relate to the manufacture and sale of Goods. The Licensor shall have free and full access thereto at any reasonable hour of the day during which the Licensee's offices are open and in any reasonable manner. In the event an examination of Licensee's books and/or records reveals a deficiency in royalties paid to Licensor of more than One Thousand United States Dollars ($1000), Licensee shall pay all expenses related to the performance of the examination and shall immediately pay the deficient amount to Licensor.
   (b) Licensee shall ensure that all invoices for the sale of the Goods will include the quantity and description of each of the Goods itemized by version, style, with the name of Jackie Robinson within the invoice item description.
   (c) For audit purposes, Licensee must provide the auditor the detail of each period's reported sales and returns, to the invoice/credit memo level, in Excel format. Each sale/return must detail the License number, invoice/credit memo number, date, customer name, ship to address, product number and description, gross sale and discounts, FOB point of shipment, units sold/returned, and royalty rate.

9. **Goodwill.**
Licensee acknowledges that the Property is unique and original and that the Licensor is the owner thereof. Licensee shall not manufacture, market or sell any confusingly similar unlicensed products that are intended to, or that consumers would reasonably believe, trade off the goodwill of the Property licensed hereunder. Licensee shall not, during the Original Term of the Agreement or at any time thereafter, dispute or contest, directly or indirectly, the Licensor's ownership of the Property; the Licensor's exclusive right (subject to this license) to use the Property; the validity of any of the copyrights or trademarks pertaining thereto or the Licensor's ownership thereof, nor shall the Licensee assist or aid others in doing so. At the Licensor's request the Licensee shall cooperate with the Licensor in preventing or stopping any infringement or unfair use by any third party of the Goods or Property. The Licensor shall determine what action, if any, it elects to pursue in regard to preventing or stopping any infringement or unfair use by any third party of the Goods or Property and shall be under no obligation whatsoever to take action at Licensee's request.

10. **Credit Line.**
    (a) Licensee warrants that it will provide a legally sufficient credit line on the Goods and packaging, wrapping, advertising and promotional material bearing any reproductions of the Goods or Jackie Robinson, in the following format:

    Jackie Robinson™ licensed by Mrs. Rachel Robinson
    www.JackieRobinson.com

    (b) Licensee warrants that it will provide a legally sufficient trademark notice by prominently displaying the letters TM against every occurrence of Jackie Robinson on the Goods and against every occurrence on packaging, wrapping, advertising and promotional material for the Goods.
    (c) Licensee warrants that it will take such precautions as are necessary to insure that any promotional materials for the Goods which utilize the Property made by its customers bear the Licensor's copyright and/or trademark notice as provided in paragraph 10 (b & c).

11. **Right of Termination.**
Without prejudice to any other rights, Licensor shall have the right to terminate this Agreement, or a portion thereof, upon written notice to Licensee, at any time that the following may occur:
    (a) If full and regular production and aggressive marketing has not commenced within twenty-four (24) months from the date of this Agreement. Any individual categories of Goods granted in paragraph 2(a) not in distribution throughout the Territory within twenty-four (24) months are subject to revocation of production rights. If the Goods are out of production for more than twenty-four (24) consecutive months, Licensor may terminate the production rights for the particular category of Goods, that particular Good in a particular territory, or terminate the entire Agreement at Licensor's sole discretion.
    (b) If Licensee shall fail to make any payment due hereunder or to deliver any of the statements herein referred to, and if such default shall continue for a period of five (5) days after written notice of such default is sent by Licensor to

Licensee.

(c) If Licensee is involved in any act of bankruptcy or insolvency, then Licensor shall have the right to terminate this Agreement. Notwithstanding the foregoing, Licensor shall, at any time during the term of this Agreement, have the option of demanding an assurance from Licensee of Licensee's ongoing ability to perform the provisions of this Agreement. Unless reasonable and adequate assurance is received by Licensor from Licensee concerning Licensee's ability to perform, Licensor shall have the right to terminate this Agreement.

12. **Sales after Expiration**.

Upon expiration or termination (for whatever reason) of this Agreement, Licensee shall be permitted to sell or ship its remaining inventory of Goods following the termination date of this Agreement by paying any royalties at the highest retail price sold over the prior twelve (12) months. The Licensee shall not, without prior written consent of the Licensor, sell or ship any such remaining Goods as distress merchandise, or to unaffiliated third parties for eventual resale, or otherwise than in the ordinary course of business. Licensee shall not stockpile inventory prior to expiration or termination of this Agreement for purposes of sale or shipment thereafter. For purposes of this Agreement, a distress sale shall be defined as one in which the merchandise is sold for less than fifty percent (50%) of the normal wholesale selling price.

13. **Rights reserved by Licensor**.

Any and all rights in and to said Property which are not expressly granted to the Licensee are hereby reserved by the Licensor. Any one or more of such reserved rights may be exercised or enjoyed by the Licensor, directly or indirectly, at any and all times.

14. **Licensor's Claim**.

Whatever claim Licensor may have against Licensee hereunder for royalties and/or for damages shall become a first lien upon all of said Goods manufactured or produced pursuant to the terms of this Agreement in the possession or under the control of Licensee or its agents upon the expiration or termination of this Agreement.

15. **Remedies**.

All specific remedies provided for in this Agreement shall be cumulative and shall not be exclusive of one another or of any other remedies available in law or equity. Failure of either party to insist upon strict performance of any of the covenants or terms hereof to be performed by the other party shall not be construed to be a waiver of any such other covenants or terms. Should Licensor be forced to initiate legal action due to Licensee's breach hereof, then all legal costs incurred therein by Licensor shall be recoupable by Licensor.

16. **Licensee's Indemnification & Product Liability Insurance**.

Licensee hereby agrees to be solely responsible for, to defend and indemnify Licensor and its respective officers, agents and employees, and to hold each of them harmless from any claims, demands, causes of action or damages, including reasonable attorney's fees arising out of the distribution or use of the Goods. Licensee will obtain and maintain product liability insurance at least in the amount of $1,000,000 with a deductible of not more than $10,000 (certificate of which shall be furnished to Licensor) providing adequate protection for Licensor and its respective officers, agents, and employees against any claims, demands, arising out of any alleged defects in Goods or any use thereof. Such insurance policy shall provide that it may not be cancelled without at least ten (10) days written notice to Licensor.

17. **Licensor's Warranty**.

Licensor represents and warrants to Licensee that it has the power to enter into this Agreement. Should any third party assert a claim, demand, or cause of action against Licensee contesting Licensor's ownership of the Property in relation to Licensee's use of the Property under this Agreement, Licensor shall have the option to undertake and conduct the defense of any such claim, demand or cause of action. Licensee may, but shall not be obligated to join in such defense and be represented by its own counsel. If Licensee elects to be represented by its own counsel, Licensee will pay its own attorney's fees. Licensee agrees that while it may counsel Licensor concerning the disposition of any such action, Licensor shall have the sole and final decision concerning the disposition of any action which involves the Property and has the right to order the Licensee to dispose of inventory and all works in progress as it sees fit. Licensor shall also have the right, in its discretion, to institute and prosecute lawsuits against third persons for infringement of the rights licensed in this Agreement and provided that upon notification by Licensee identifying infringement of said rights by third parties, Licensor agrees to

take reasonable steps to investigate and prevent any ongoing infringement. Any lawsuit shall be prosecuted solely at the cost and expense of the Licensor and all sums recovered in any such lawsuits, whether by judgment, settlement or otherwise, shall be retained solely and exclusively by the Licensor. Upon request of the Licensor, the Licensee shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. The Licensor shall reimburse the Licensee for all reasonable expenses incurred as a result of such cooperation.

18. **No Partnership or Joint Venture**.
This Agreement does not constitute and shall not be construed as constituting a partnership, agency, or joint venture between Licensor and Licensee. The Licensee shall have no right to obligate or bind Licensor in any manner whatsoever and nothing herein contained shall give or is intended to give any right of any kind to any third party.

19. **No Assignment**.
The license hereby granted is and shall be personal to the Licensee and shall not be assignable by any action of the Licensee or by operation of the law, and any attempt at such assignment shall be null and void. The Licensee shall have no right to grant any sublicenses. Notwithstanding the foregoing, Licensee may use third parties for the manufacturing of the Goods, provided that such third parties do not sell or distribute the Goods, except when doing so as a wholesale customer of Licensee. This Agreement shall inure to the benefit of and shall be binding upon Licensor's successors and assigns.

20. **Notice**.
Any notice required to be given under this Agreement shall be sent to the respective parties, both (a) in writing, mailed to the address as set forth below, and (b) via e-mail communication, sent to the e-mail address as set forth below.

    If to Licensor:    CMG Worldwide, Inc.
                         Attn: Samantha Chang or Legal Department
                         9229 W. Sunset Boulevard, Suite 950,
                         West Hollywood, California 90069
                         Email: Samantha@CMGWorldwide.com and Legal@CMGWorldwide.com

    If to Licensee:    Dreams Fulfilled, LLC
                         Attn: Jay Caldwell
                         4824 102nd Ln NE
                         Kirkland, Washington 98033
                         E-mail: jay@dreamsfulfilledllc.net

                         With a copy to:

                         Karr Tuttle Campbell
                         Attn: Adam D. Matherly
                         701 Fifth Avenue, Suite 3300
                         Seattle, Washington 98104
                         Email: amatherly@karrtuttle.com

Such addresses and email addresses may be subsequently modified by providing notice in accordance with this Section.

21. **Entire Agreement**.
This Agreement contains the entire understanding of the parties. There are no representations, warranties, promises, covenants or understandings other than those herein contained.

22. **Confidentiality**.
This Agreement and the contents hereof constitute a confidential business relationship between the parties. Each party acknowledges that significant damage could be done to the other one should the terms of this Agreement become public

knowledge. Both parties agree that they will not reveal the terms of this Agreement to any third party (excluding agents, attorneys, representatives, and others with whom they have a legal obligation to disclose) and that they will exercise reasonable precautions to insure that neither they nor their employees or agents shall allow the terms of the Agreement to become public knowledge. Terms of this Agreement previously disclosed to third parties are excluded from this provision.

23. **Disclaimer.**
This Agreement in no manner absolves Licensee of its responsibility, if any, to procure legally sufficient permission from the copyright owner(s) of the photographs, illustrations, and/or artwork utilized in conjunction with the Property for the manufacture and distribution of the Goods. Licensee agrees to indemnify and hold harmless Licensor and its agent(s) from any and all claims made by third parties with respect to copyrighted materials utilized in connection with this Agreement.

24. **Construction & Jurisdiction.**
    (a) This Agreement shall be construed in accordance with the laws of the state of California.
    (b) Nothing in this Agreement is intended to be contrary to the laws of any country or political subdivision thereof. In the event that any of the paragraphs or particular terms or conditions set forth within any paragraphs are held to be unenforceable by a court of record with competent jurisdiction, such paragraph or particular term of condition therein shall be deemed to be stricken from this Agreement within the jurisdiction of such court and the Agreement shall otherwise remain in full force and effect in such jurisdiction and in its entirety in other jurisdictions.
    (c) Notwithstanding any present or future legal decisions in any jurisdiction, regarding the necessity of Licensee to be licensed hereunder, Licensee agrees to pay royalties as provided herein for as long as it exploits the Property.
    (d) Each party has cooperated in the drafting and preparation of this Agreement. Hence, this Agreement will be construed neutrally, and will not be applied more strictly against one party than another.

25. **Forum Selection Clause.**
Both parties acknowledge and consent that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled within any court located in the State of California, agreeing that any such court would have exclusive jurisdiction over any dispute, case or controversy arising under or in connection with this Agreement, and that such any California court shall be a proper forum in which to adjudicate such dispute, case or controversy. The prevailing party in any action above shall be allowed to recoup any and all attorney fees, interest and costs therein.

26. **Multiple Counterparts and Facsimile Signatures.**
This Agreement may be executed in any number of counterparts, including facsimile counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement. Signatures conveyed by facsimile transmission shall serve to bind the parties to this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed by their duly authorized officers as of the day and year first above written.

"Licensor"

Estate of Jackie Robinson

*/s/ Mark Roesler*

Name: Mark Roesler
Title: Chairman & CEO

"Licensee"

Dreams Fulfilled, LLC

*/s/ Jay Caldwell*

Name: Jay Caldwell
Title: Manager

# EXHIBIT 2

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

TYLER L. FARMER

E-MAIL: TYLERF@HARRIGANLEYH.COM
FACSIMILE: (206) 623-8717

September 10, 2018

**Settlement Communication Covered by Federal Rule of Evidence 408**

*Via Email and Federal Express*

Mark Roesler, Chairman & CEO
CMG Worldwide Inc.
10500 Crosspoint Blvd.
Indianapolis, IN 46256

CMG Worldwide, Inc.
Attn. Samantha Chang
9229 W. Sunset Blvd, Ste 950
West Hollywood, CA 90069

Re: License Agreement with the Estate of Jackie Robinson

Dear Mr. Roesler and Ms. Chang:

We represent Dreams Fulfilled, LLC (Dreams Fulfilled) in connection with the license rights obtained from the Estate of Jackie Robinson by the February 27, 2018, License Agreement. Recent developments have made clear that you and/or your client have acted in disregard for the contract and Dreams Fulfilled's license rights.

Dreams Fulfilled has relied on your representations and its license rights in investing hundreds of thousands of dollars to develop agreed-upon memorabilia and related business efforts. Your efforts to frustrate the parties' performance violate the contract and California law and would deprive Dreams Fulfilled of millions of dollars over the course of the license term.

We have been instructed to file the attached lawsuit on Friday, September 14, 2018. In the meantime, Dreams Fulfilled stands ready to discuss an amendment to the License Agreement that would legally address your apparent intent to withdraw from the relationship while compensating Dreams Fulfilled for the significant losses it will suffer through the obstruction of its business plans. In order to compromise, Dreams Fulfilled will accept $1.8 million in full satisfaction of its multi-year license rights under the License Agreement. We will postpone the filing of the lawsuit upon receipt of your confirmation that you are willing to resolve the parties' dispute as described above.

If Dreams Fulfilled is forced to litigate its rights under the License Agreement, it will vigorously pursue its claims against all parties, including tort claims and punitive damages.

Very truly yours,

HARRIGAN LEYH FARMER & THOMSEN LLP

Tyler L. Farmer

TLF:fcf
Enclosure